Martha G. Whitfield v. Commissioner.
Whitfield v. Commissioner
Docket No. 4898-69.
United States Tax Court
T.C. Memo 1972-139; 1972 Tax Ct. Memo LEXIS 118; 31 T.C.M. (CCH) 654; T.C.M. (RIA) 72139; June 28, 1972, Filed. Claude L. Rowe Security Bk. Bldg., Fresno, Calif., and Lucius Powers, for the petitioner. Albert L. Sandlin and Allan D. Teplinsky, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1951 through 1959 and additions to such tax under sections 293(b) and 294(d)(1)(A), Internal Revenue Code of 1939, and section 6653(b), Internal Revenue Code of 1954, as follows: Sec.
Sec. 293(b),
Sec. 6653(b),
294(d)(1)(A),
Year
Deficiency
I.R.C. 1939
I.R.C. 1954
I.R.C. 1939
1951
$11,156.12
$5,578.06
$ 996.77
1952
4,500.84
2,250.42
398.19
1953
5,575.47
2,787.74
500.36
1954
993.46
$ 496.73
77.49
1955
394.53
197.27
1956
1,221.77
610.88
1957
18,604.14
9,302.07
1958
16,107.98
8,053.99
1959
8,274.79
4,137.40
The issues for decision are: (1) Whether petitioner filed fraudulent Federal income tax returns for 1951 through 1959; if not, the assessments of additional tax liabilities for those years are barred by sections 275(a), Internal Revenue Code *120 of 1939, and 6501(a), Internal Revenue Code of 1954, and the additions to tax under sections 293(b), Internal Revenue Code of 1939, and 6653(b), Internal Revenue Code of 1954, are not applicable; and (2) If assessments for 1951 through 1959 are not barred by the applicable statutes of limitations, whether respondent correctly determined the amounts of any underpayments for those years. Findings of Fact Martha G. Whitfield, petitioner, was a legal resident of Delano, California, at the time she filed her petition. She filed her Federal income tax returns for 1951 through 1959 with the district director of internal revenue, Los Angeles, California. Petitioner married Harold O. Whitfield (hereinafter referred to as Whitfield) in Beaumont, Texas, in 1920. Shortly thereafter, in 1922, she and her husband moved to California. For the next approximately 17 years, Whitfield worked for Richfield Oil Company; for about five of those years he was a distributor of the company's products in Merced. In 1940, Whitfield applied to become a distributor of Tidewater Associated Oil Company (hereinafter Tidewater) products in Delano. He was granted the distributorship, *121 and on September 16, 1940, he applied for a distributor's bond in the amount of $1,000 from Fidelity and Deposit Company 655 of Maryland in favor of Tidewater. As part of the application for this bond, Whitfield was required to submit a financial statement. This statement disclosed that he had net assets of $19,544.89. As a distributor of Tidewater products, Whitfield sold gasoline, oil, tires, batteries, and accessories to service stations and farmers in the Delano area. His business premises consisted of a piece of land in which were buried tanks that collectively held 100,000 gallons of fluids and on which was located a warehouse. He also had a couple of tank trucks and a pickup truck for use in his business. Whitfield sold some products on a commission basis; others he purchased and resold at a price which he determined. During 1940 through 1947, Tidewater paid Whitfield the following commissions: Year
Amount
1940
$ 2,048.71
1941
10,792.98
1942
11,700.72
1943
9,087.38
1944
10,639.28
1945
13,596.19
1946
14,925.13
1947
15,681.22
Whitfield's business as a bulk oil and gas distributor was a substantial one. In addition to supplying several *122 service stations, he sold products to most of the large farmers in the area. One farm alone, the Di Giorgio Farms, annually purchased in excess of 100,000 gallons of gasoline from him. Several other customers purchased similar quantities of the products he hold. However, based on the tax liabilities which Whitfield and petitioner reported between 1940 and 1947, Whitfield's taxable income did not exceed the following amounts: Gross
Taxable
Year
Income
Income
1940 [1]
$2,000.00
1941
$ 2,078.65
1942
1,977.12
1943
2,352.85
1944 [1]
500.00
1945
2,175.20
1946
4,798.00
1947
4,648.00
$2,500.00
$18,029.82
In 1946, Whitfield suffered a heart attack. He had a second one in 1947, and he then terminated his association with Tidewater. At this time, he sold the trucks which he had been using in his business and he removed the storage tanks from the ground and sold them. He also commenced construction *123 of a motel on the land which he had previously been using in his bulk oil and gas business. The cost of the original 14 units in the motel was $63,064.34. This expenditure was partially financed with $16,000 borrowed at 5 percent interest on April 14, 1948, from The First National Bank in Delano, California (hereinafter The First National Bank). As part of the application for this loan, Whitfield and petitioner submitted a financial statement in which they reported net assets as of January 29, 1948, worth $118,164; of this amount, $107,000 was stated to be the value of the motel, the family residence, and the warehouse located on the land; only $8,251.54 was listed as "Cash on hand and in bank." The initial 14 units were completed and put into operation early in 1948. By February 24, 1949, the entire amount borrowed to finance the construction had been repaid. On April 22, 1948, shortly after the motel commenced operation, Whitfield died leaving a will which he had executed on July 31, 1946. This will provided, in part, as follows: Everything that I possess is hereby willed to my wife, Martha G. Whitfield. As of this date my estate consists of the following - 1. Real estate *124 and improvements known as 310-320 High Street, in the City of Delano, California. 2. Twenty Eight Hundred Eighty and 83/100 Dollars ($2880.83) Commercial checking account at the First National Bank in Delano, California. 3. Five Thousand and no/100 ($5000.00) Savings account at the First National Bank in Delano, Calif.
4. Five Thousand Dollars ($5000.00) double Indemnity Ordinary life insurance policy dated January 21-1928 with the Travelers Insurance Company of Hartford, Connecticut. 5. Twenty Five Hundred Dollars ($2500.00) Postal Savings Certificates now in my safety deposit Box #419 at the First National Bank in Delano, Calif.
6. One 1937 Chevrolet gasoline tank truck. 7. One 1936 Dodge gasoline tank truck. 8. One 1939 Studebaker pick up truck. 656 9. One 1939 LaSalle Sedan passenger car. 10. All monies due me from Tidewater Associated Oil Co. of San Francisco, Calif., representing commissions of approximately $1000.00 for sales during the respective preceeding [sic] month. 11. All monies due me from Tidewater Associated Oil Co. for commissions on sales from the first of the current month. 12. All monies due me from various firms in Delano, California *125 and adjacent territory for automobile supplies delivered as per records in my office. 13. All credits due me from Tidewater Associated Oil Co. for auto supplies delivered to the operator of service station #414 at Delano, California, during the preceeding [sic] and current month. 14. The entire stock of auto supplies on hand at my office which are wholly owned and free of any encumbrance, except any money due Tidewater Associated Oil Co. for auto supplies shipped to me on monthly open account which have not been billed to me for the current month. 15. All of my interest, right and title to furniture, office equipment, Bulk plant equipment and/or any and all other or additional assets not mentioned, including all personal effects. The will was admitted to probate and petitioner was appointed executrix of Whitfield's estate. On October 27, 1949, petitioner, as executrix of the estate, filed an inventory with the Superior Cort of the State of California in Kern County. Included in the inventory were individually owned assets, including two automobiles and a judgment having a value of $1,970, and jointly owned property having a value of $65,434. The jointly owned property included *126 the motel, stock in City Service Company, and $5,562 cash on deposit with The First National Bank. No other cash was shown as an asset of the Estate. In 1951, petitioner decided to expand her motel by adding 8 new units. She did this by remodeling, at a cost of $26,894.18, the warehouse which had been used in connection with Whitfield's oil and gas distributorship. These improvements were partially financed with $15,000 borrowed at 5 percent interest from The First National Bank on December 4, 1951. The remodeling was completed by April 1, 1952, and the borrowed funds had been completely repaid by October 31, 1952. Also during 1951, petitioner purchased, with cash, a residence in Malibu at a cost of $18,484.85. Petitioner again expanded her motel in 1954 by adding thereto 8 new units at a cost of $34,269.97; this addition brought the total number of units to 30. The new units, completed by July 1, 1954, were financed with $40,000 borrowed at 5 percent interest from The First National Bank in September 1953. These funds were completely repaid by November 23, 1954. In 1956, the main highway on which petitioner's motel was located was moved in order to bypass Delano. During *127 1957, petitioner loaned $50,000 in $50 and $100 bills to Hollis Roberts. These funds were not withdrawn from any bank account but rather were taken from an accumulation of funds which petitioner kept in her home. Between December 1958 and March 1963, the full amount of this loan together with interest at the rate of 10 percent, was repaid to petitioner. Again, in 1958, petitioner made improvements to her motel. This time she added a cocktail lounge at a cost of $80,941.80. These improvements were completed by July 1, 1959. When petitioner rented a room in her motel, a registration card was filled out showing the rate for the room and the period for which the room was rented. She also prepared a monthly report of her gross receipts which she submitted to her accountant. The amounts shown as income on the monthly report generally equaled the deposits which petitioner made twice a month at her bank. At the same bank petitioner frequently exchanged motel receipts, consisting of cash and checks of small denominations, for $20, $50, and $100 bills which she did not deposit. Petitioner had assets and liabilities at the end of each of the calendar years 1950 through 1959, with a cost *128 basis in the amounts shown in the tables [1] set forth in the immediately following pages: 657 ASSETS AND
LIABILITIES
1950
1951
1952
1953
1954
ASSETS
Cash in Banks
$ 3,001.22
$ 15,906.66
$ 1,121.74
$ 8,881.67
$ 1,487.23
Motel Land
1,584.40
1,584.40
1,584.40
1,584.40
1,584.40
Depreciable
65,884.82
68,624.08
97,300.08
98,432.85
132,702.62
Assets
Less Reserve for
(12,883.60)
(16,665.63)
(22,246.27)
(26,952.99)
(32,853.3
Depreciation
Buildings in
9,873.31
7,381.57
Process
Other Real Estate
10,300.00
28,784.85
28,784.85
32,144.85
32,144.85
Other Assets
187.20
187.20
187.20
2,662.00
2,662.00
Total Assets
$ 68,074.04
$108,294.87
106,732.00
$124,134.35
$137,727.73
LIABILITIES
Bank Loans
$ 15,000.00
$ 8,164.75
Payable
Other Loans
$ 1,450.00
5,000.00
Payable
Total Liabilities
$ 15,000.00
$ 1,450.00
$ 13,164.75
NET WORTH
$ 68,074.04
$ 93,294.87
$106,732.00
$122,684.35
$124,562.98
ASSETS AND
LIABILITIES
1955
1956
1957
1958
1959
ASSETS
Cash in Banks
$ 10,602.98
$ 6,477.91
$ 708.48
$ 7,463.45
$ 1,427.01
Loan Receivable
50,000.00
40,000.00
30,000.00
--Hollis Roberts
Motel Land
1,584.40
1,584.40
1,584.40
1,584.40
1,584.40
Depreciable
132,702.62
134,829.30
152,546.29
152,546.29
233,488.09
Assets
Less Reserve for
(39,084.15)
(45,572.66)
(52,875.34)
(59,130.51)
(66,923.56)
Depreciation
Buildings in
38,391.66
Process
Other Real Estate
28,784.85
28,784.85
13,784.85
13,784.85
13,784.85
Other Assets
2,802.92
4,646.58
4,646.58
4,200.00
4,200.00
Liquor License
6,042.44
6,042.44
Inventory - Bar
1,908.52
Total Assets
$137,393.62
$130,750.38
$170,395.26
$204,882.58
$225,511.75
LIABILITIES
Loans Payable
$ 13,873.08
$ 5,708.33
$ 5,708.33
$ 5,708.33
NET WORTH
$123,520.54
$125,042.05
$164,686.93
$199,174.25
$225,511.75
*129 658 During 1951 through 1959, petitioner made nondeductible expenditures and received nontaxable amounts, including dividend exclusions and gifts, as follows: Nondeductible
Nontaxable
Year
expenditures
receipts
1951
$3,200.00
1952
3,200.00
1953
3,200.00
1954
4,222.21
$ 20.00
1955
4,228.80
26.80
1956
n1 5,565.99
33.00
1957
4,721.60
33.60
1958
6,011.09
162.91
1959
4,537.00
5,780.33
[1]
[1]
In her income tax returns for 1951, 1952, and 1954 through 1959, petitioner reported the following amounts of adjusted gross income: Year
Amount
1951
$ (207.71)
1952
199.60
1954
228.29
1955
1,075.23
1956
(1,025.43)
1957
(6,626.82)
1958
644.73
1959
Petitioner's *130 income tax return for 1953 has been lost or destroyed and was not introduced in evidence. Nor were its contents shown by secondary evidence. Based on the amount of tax which she paid for that year, she reported taxable income in the amount of approximately $266.38 for 1953. On February 10, 1961, petitioner was contacted by two special agents of the Internal Revenue Service for information relating to her income tax liabilities. at this meeting, petitioner stated that she did not have, and at least since her husband's death had not had, any large accumulation of cash. Thereafter, on February 13, 14, and 15, one of the special agents examined the books and records made available to him by petitioner. Among those records were checks bank statements, and individual room registration cards of guests at the motel. On February 15, petitioner requested that the agent suspend his investigation until the following Monday, and he did so. When the agent called petitioner on the following Monday, he was informed that she had turned her books and records over to a certified public accountant. The agent next called petitioner on May 11, 1961, and asked to examine her canceled checks, room registration *131 cards, and invoices for the period from January 1, 1956, through December 31, 1960. At that time he was informed that petitioner had destroyed the registration cards and invoices. The agent also called upon the certified public accountant where he learned that petitioner, on May 4, 1961, had filed a late estate tax return, together with a payment for the tax, late penalty, and interest, for the estate of her deceased husband. In the return, she reported an item designated "Cash Decedent's community 1/2 interest $54,656.70." On May 22, 1961, the agent again spoke to petitioner, and she told him that her father had given her a total of $16,000 in small amounts over a number of years and that she had inherited $109,313.41 in cash from her husband in 1948. On March 31, 1965, petitioner was indicted on two counts of having violated section 7201 for 1958 and 1959, respectively, in that she willfully attempted to evade or defeat a tax owed for each year. She was tried before a jury in the United States District Court for the Eastern District of California and was convicted on both counts. Her conviction was affirmed by the Court of Appeals for the Ninth Circuit. Whitfield v. United States, 383 F. 2d 142 *132 (C.A. 9, 1967). Respondent issued a notice of deficiency in which he determined that petitioner had fraudulently understated her taxable income for 1951 through 1959. Ultimate Findings of Fact Petitioner's adjusted gross income for 1951 through 1959 was as follows: Adjusted Gross
Income
Year
Recomputed
Reported
Unreported
1951
$28,420.83
$ (207.71)
$28,628.54
1952
16,637.13
199.60
16,437.53
1953
19,152.35
[1] 266.38
18,885.97
1954
21,080.84
228.29
20,852.55
1955
21,159.56
1,075.23
20,084.33
1956
19,054.50
(1,025.43)
20,079.93
1957
14,332.88
(6,626.82)
20,959.70
1958
25,335.50
644.73
24,690.77
1959
25,094.17
[2] 6,350.02
18,744.15
Opinion Since petitioner filed her Federal income tax returns for the years in issue more than 659 3 years prior to the date of the mailing of the notice of deficiency, sections 275(a), Internal Revenue Code *133 of 1939, and 6501(a), [2] Internal Revenue Code of 1954, bar the disputed deficiencies unless respondent can show that for each year she filed a "false or fraudulent return" with the "intent to evade tax" within the meaning of sections 276(a), Internal Revenue Code of 1939, and 6501(c) (1), [3] Internal Revenue Code of 1954. And, of course, in order to sustain the additions to the tax under sections 293(b), Internal Revenue Code of 1939, and 6653(b), [4] Internal Revenue Code of 1954, respondent must establish fraud. *134 The burden of proving fraud is placed upon respondent by statute. Sec. 1112, I.R.C. 1939; sec. 7454(a), I.R.C. 1954. To satisfy this burden, he must produce evidence which clearly and convincingly establishes that each tax return in question is fraudulent. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), reversing on another issue a Memorandum Opinion of this Court; Estate of Ernest Clarke, 54 T.C. 1149, 1161-1162 (1970); W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, u.k.). We hold that he has presented such evidence with respect to each of the years 1951 through 1959, with the exception of 1953. [5] We have reached this conclusion without giving weight to any of the determinations made by respondent in the notice of deficiency.
*135 The agents of the Internal Revenue Service found petitioner's books and records inadequate and incomplete. Because petitioner destroyed her motel guest registration cards during the course of the investigation, the agents were unable to compare these primary records of her gross receipts from the motel business with her general ledger. In addition, the testimony showed that petitioner did not deposit all of her motel receipts, and only the deposited receipts were reported as income. Further, the agents' investigation disclosed that petitioner's net worth, computed with reference to the cost of her assets, increased each year in amounts which exceeded her reported income and nontaxable receipts. In these circumstances, respondent was fully justified in resorting to an indirect method of income reconstruction, i.e., the net worth increase and nondeductible expenditures method. See, generally, Morris Lipsitz, 21 T.C. 917, 931 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). In weighing the evidence on petitioner's increase in net worth and her nondeductible expenditures, we are aided by certain stipulations *136 of fact. An agreed exhibit, summarized in our Findings, describes in tabular form petitioner's assets and liabilities as of December 31, 1950, the day before the beginning of the taxable years in controversy. Thus, petitioner's opening net worth was shown. The exhibit also shows her assets and liabilities at the end of each year covered by the notice of deficiency. Other stipulations set forth petitioner's nondeductible living expenses for each year as well as her nontaxable receipts. The Internal Revenue Service agents made extensive investigations of all available leads to ascertain whether petitioner had other sources of nontaxable founds which would explain her substantial yearly increases in net worth. The very obvious, likely source of petitioner's net worth increase is her motel and cocktail lounge business in which she and her husband had invested over $235,000 by the end of 1959. We think respondent has made a showing that the increases in net worth reflected in 660 our Findings, as well as the stipulated nondeductible expenditures, constitute income which was not reported during each of the years in controversy. Holland v. United States, 348 U.S. 121 (1954), *137 rehearing denied 348 U.S. 932 (1955). The evidence of fraud is clear and convincing. Our Ultimate Findings show that the amounts of petitioner's understatements of income were substantial during each of the years in controversy. The fact that her income was understated may not be sufficient evidence, by itself, to establish that her returns were fraudulent. John Marinzulich, 31 T.C. 487, 490 (1958); Foster v. Commissioner, 391 F. 2d 727, 733 fn. 10 (C.A. 4, 1968), remanding on another issue a Memorandum Opinion of this Court. However, her understatements of income were substantial, and they are some evidence of fraud, Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), modifying on another issue a Memorandum Opinion of this Court (effective evidence); Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956), affirming per curiam a Memorandum Opinion of thid Court (highly persuasive evidence); and Tsuneo Otsuki, 53 T.C. 96, 107 (1969) (strong evidence). Moreover, her repeated understatements of income in successive years, coupled with other circumstances - so-called badges of fraud - showing *138 intent to conceal or misstate taxable income, demonstrate a fraudulent intent to evade taxes known to be due. Furnish v. Commissioner, 262 F. 2d 727, 728-729 (C.A. 9, 1958), remanding on another issue 29 T.C. 279 (1957); Anderson v. Commissioner, 250 F. 2d 242, 250 (C.A. 5, 1957), remanding on another issue a Memorandum Opinion of this Court, certiorari denied 356 U.S. 950 (1958); Drieborg v. Commissioner, supra at 219; Kathleen C. Vannaman, 54 T.C. 1011, 1018-1019 (1970). The badges of fraud are unmistakable. While petitioner's books and records are not in evidence, the testimony is that they reflect the amount of income reported in her income tax returns. She supplied to a bookkeeper the information contained in her records. Proof that her records were "incomplete and inaccurate, and that the petitioner did not supply the bookkeeper with all of the data necessary for maintaining complete and accurate records" are support for an inference of fraud. Merritt v. Commissioner, 301 F. 2d 484, 487 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court; Baumgardner v. Commissioner, 251 F. 2d 311, 314 *139 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; Jacob D. Farber, 43 T.C. 407, 419-420 (1965). Furthermore, petitioner's destruction of her invoices and the individual motel registration cards, which, if accurately kept, would have been the primary indicia of her motel business gross receipts, is further evidence of an intent to conceal her true income. See Nathan Goldsmith, 31 T.C. 56, 64 (1958). Also, the testimony is that petitioner visited a bank two or three times each week and exchanged small checks and currency for $20, $50, and $100 bills. She made bank deposits much less frequently. In 1957, when she made the $50,000 loan to Hollis Roberts, the entire amount was given to him in currency in large denominations. We think the exchange of checks and smaller denominations of currency for large bills, coupled with other dealings in currency, is further evidence of an effort to conceal her income. Cf. United States v. White, 417 F. 2d 89, 92 (C.A. 2, 1969), certiorari denied 397 U.S. 912 ((1970), rehearing denied 397 U.S. 1030 (1970); Garieph v. United States, 189 F. 2d 459 (C.A. 6, 1951). *140 Moreover, during the course of the investigation by the special agents, petitioner filed an estate tax return on May 4, 1961, in which she reported that her husband, who died 13 years earlier on April 22, 1948, had left her a cash hoard in the amount of $109,313.41. Her accountant's report shows that this $109,313.41 figure was a computed one, based on her financial history during the intervening period. Having concluded, for the reasons discussed below, that petitioner's husband did not leave her a large sum of undeposited cash, we think the estate tax return was a fabrication to support her cash hoard defense. As such, it is further evidence of fraud. See United States v. Wilkins, 385 F. 2d 465, 472 (C.A. 4, 1967), certiorari denied 390 U.S. 951 (1968). In the final analysis, the only evidence supporting petitioner's cash hoard story is her own oral testimony. There is virtually 661 no corroboration, and we do not believe her testimony on this point. Neither the financial statement prepared by Whitfield in 1940, in order to secure a distributor's bond, nor the one he and petitioner prepared in 1948, in order to secure a bank loan, discloses any *141 such large accumulation of cash. Nor does the taxable income reported by Whitfield and petitioner between 1940 and 1947 indicate that they had income sufficient to permit them to make such a substantial accumulation. Furthermore, the carefully prepared will drafted by Whitfield in 1946, approximately 2 years before his death, contains a long list of his assets but does not indicate the existence of any substantial cash accumulation. We think it inconceivable that he would have so meticulously listed his other assets while omitting any mention of a fund assertedly amounting to more than $100,000 just 2 years later. Moreover, the inventory of Whitfield's estate, filed by petitioner approximately 18 months after Whitfield died, lists cash amounting to only $5,562. Only after the special agent of the internal Revenue Service had commenced his examination of petitioner's books and records in 1961 did she allege the existence of the inherited accumulation. As suggested above, the amount of the accumulation was not determined from petitioner's recollection or from any contemporaneous record. It was a figure calculated by a certified public accountant. He ascertained that the deposits *142 in petitioner's bank accounts equaled nontaxable receipts and then assumed that "the amount of cash on hand in the estate was composed of the total of disbursements made other than from the bank accounts." In making his computations, the accountant assumed that all the increases in petitioner's net worth between April 22, 1948, and December 31, 1960, as disclosed by her books and records, not attributable to her reported taxable income and her nontaxable receipts during that period, were derived from the cash which she had inherited from Whitfield. Clearly, petitioner's story is not one well calculated to inspire belief. She would have us think that she and Whitfield borrowed $16,000 in 1948 at 5 percent interest, that she borrowed $15,000 in 1951 at 5 percent interest, and $40,000 in 1953 also at 5 percent interest, while retaining the cash hoard in a tin box. According to her testimony, this was cash which she wanted to invest if she could have found a suitable borrower; yet, she claims she kept it hidden while she paid interest on her borrowings. Each of her borrowings was fully repaid within 10 to 14 months. [6] However, since petitioner's reported taxable income and nontaxable *143 receipts were insufficient to generate the funds to make these payments her accountant's report shows "Payments of bank loans $41,913.41" made out of the inherited accumulation. Petitioner would have us believe that on three separate occasions she borrowed money and paid interest on it only to repay part of such funds with the cash which she had on hand at all times. [7]
*144 In view of these and other facts of record, including a variety of inconsistencies in the testimony, we think respondent has shown by clear and convincing evidence that petitioner's returns for 1951 through 1959 (except 1953) were false and fraudulent and that underpayments of tax for those years were due to fraud. Accordingly, we hold that the bar of the statute of limitations is lifted and that the notice of deficiency was timely mailed. We hold, further, that the additions to the tax must be sustained. As to 1953, neither the original income tax return nor evidence of its contents was 662 introduced in evidence. The only evidence presented as to the contents of that return was testimony as to the amount of the tax paid for 1953 and the amount of taxable income required to produce a tax in that amount. The secondary evidence as to the contents of the 1953 return is not sufficient to show, for example, the exemptions or the amounts of the deductions properly claimed against the reported income. Cf. Granquist v. Harvey, 258 F. 2d 599 (C.A. 9, 1958). As to 1953, therefore, we conclude respondent has failed to prove that the return was false or fraudulent. Putman v. United States, 301 F. 2d 751 *145 (C.A. 6, 1962); Drieborg v. Commissioner, supra at 219. We hold that assessment of any deficiency for 1953 is barred by the statute of limitations. The respondent having shown that the assessments of the deficiencies for all the years in controversy, except 1953, are not barred by limitations, the burden shifted to petitioner to show any errors in the amounts of the determined deficiencies. Jackson v. Commissioner, 380 F. 2d 661, 664 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court, certiorari denied 389 U.S. 1015 (1967); Bryan v. Commissioner, 209 F. 2d 822, 825 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court,, certiorari denied 348 U.S. 912 (1955). One error alleged in the petition is that, assuming petitioner had the determined additional income, the notice of deficiency improperly allocates it to the several years. In this connection, respondent's net worth increase computations have the effect of including in income for 1957 the full amount of the $50,000 loaned to Hollis including in income for 1957 the full $38,391.66 expended in that year for construction of the cocktail lounge. We *146 think it unrealistic in the light of the evidence to conclude that those funds were all earned in 1957 and 1958. Our Findings shown that petitioner borrowed $16,000 in 1948 and repaid it within 10 months; borrowed $15,000 in 1951 and repaid it within 11 months; and borrowed $40,000 in 1953 and repaid it within 14 months. During 1954, 1955, and 1956, in contrast, she apparently incurred no unusual expenditures; yet, her net worth, accoding to respondent's computations, increased only $1,878.63 in 1954 and $1,521.51 in 1956 and decreased $1,042.44 in 1955. We think the only reasonable inference is that part of the $50,000 loaned to Hollis Roberts in 1957 and part of the cocktail lounge construction money in 1958 were earned by petitioner during 1954, 1955, and 1956. Our Ultimate Findings reflect our conclusions as to how the net worth increase should be allocated to the several years. Petitioner on brief presses two matters on which the Court ruled at the trial. First, she contends that the stipulation of facts, including particularly the exhibit which details her assets and liabilities at the end of each year, was not properly admissible, because the stipulation was not signed by *147 both of her attorneys of record. We think the objection lacks merit. The stipulation, containing paragraphs 1 through 17, was signed by one of the two attorneys of record, and a supplemental stipulation of facts, containing paragraphs numbered 18 through 21, was signed by the same attorney as well as petitioner. Petitioner does not question the authority of that attorney to represent her, and he had the same authority to represent her as the attorney now pressing the objection. See Lake v. Wilson, 183 Ark. 180, 35 S.W. 2d 597, 601 (1931); cf. Fred M. Saigh, Jr., 26 T.C. 171, 176-177 (1956). The stipulation and annexed exhibits were properly admitted. Significantly, petitioner offered no evidence inconsistent with the stipulated facts and suggests no way in which she has been prejudiced. Petitioner was free to, and did, offer testimony as to assets not shown in the disputed exhibit. Moreover, basically the same evidence was presented at the trial of this case as at the trial of the criminal case. Most of the facts which were stipulated had been established at the criminal trial through extensive testimony. Thus, they were precisely the kind of facts which *148 the Rules of this Court direct the parties to stipulate. Rule 31, Rules of Practice, United States Tax Court. We can think of no reason why, in this particular case, petitioner was entitled to the "lawyer's advantage" of forcing respondent to prove by oral testimony facts about which there was no genuine dispute. The second objection pressed by petitioner is with respect to the admissibility of the transcript of the trial of the criminal case. Both parties used portions of the 663 transcript for impeachment purposes with respect to witnesses who testified at both proceedings, and such portions were admissible for that purpose. Respondent alleged in his answer that petitioner was collaterally estopped by the criminal conviction from denying that her returns for 1958 and 1959 were fraudulent. At the trial, respondent urged that petitioner was collaterally estopped from asserting her cash hoard defense. The transcript, along with the indictment and judgment of the court in the criminal case, was admissible in connection with that allegation. In other respects, we have based none of our Findings on the transcript of the criminal trial. [8]
*149 To reflect the foregoing conclusions, [9]
Decision will be entered under Rule 50. Footnotes
1. Neither Whitfield nor petitioner filed a tax return for these years. The amounts shown on the above table constitute the maximum gross income they could have received in those years without being required to file an income tax return.↩
1. These tables are summaries of a detailed stipulated exhibit which sets forth specific assets and liabilities of petitioner. Other computations, such as petitioner's net worth, net worth increases, adjusted gross income, and adjustments to gross income appearing on that exhibit, were not stipulated by the parties.↩
1. This figure includes an unallowable loss for 1956 in ↩
1. This figure includes an unallowable loss for 1956 in the amount of $800.↩
1. This figure represents the amount of taxable income which petitioner reported for 1953. ↩
2. In the notice of deficiency, respondent made a mathematical error by subtracting $5,708.33 as nontaxable receipts rather than $5,780.33. This error will be corrected in the Rule 50 computation.↩
2. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
3. SEC. 6501(c). Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
4. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
5. By reason of her criminal conviction on the charge of attempting to evade or defeat the taxes for 1958 and 1959, petitioner is collaterally estopped to deny that her returns for those years were fraudulent. Amos v. Commissioner, 360 F. 2d 358 (C.A. 4, 1965), affirming 43 T.C. 50 (1964); Tomlinson v. Lefkowitz, 334 F. 2d 262 (C.A. 5, 1964), certiorari denied 379 U.S. 962↩ (1965).
6. The rapidity with which these borrowings were repaid, we think, gives some indication of the amount of petitioner's unreported income. The $16,000 borrowed in 1948 was fully repaid within 10 months; the $15,000 borrowed in 1951 was repaid within 11 months; and the $40,000 borrowed in 1953 was repaid within 14 months. Petitioner's reported adjusted gross income for 1951, 1952, and 1954, however, ranged from a loss of $207.71 to a profit of $228.29; she reported taxable income for 1953 of only $266.38. Further indication of the amount of petitioner's unreported income is the fact that she had $50,000 in cash available in 1957 to loan to Hollis Roberts. Yet, her reported adjusted gross income between 1954 and 1957 ranged from a loss of $6,626.82 to a profit of $1,075.23. We also note that during 1958 and 1959 she was able to invest a sum in excess of $80,000 in improvements to her motel, whereas her reported adjusted gross income for those years was only $644.72 and $6,350.02, respectively. ↩
7. Petitioner also contends that "$60 to $65,000" of the increase in her net worth was the result of Hollis Roberts' repayment to her in 1958, 1959, and 1960 of the $50,000 he had borrowed, together with 10 percent interest. This argument, of course, ignores petitioner's own evidence that the loan was repaid in installments and was not completely repaid until 1963. It also fails to take into account the corresponding decrease in her accounts receivable asset as each payment was made on the loan, i.e., except for the portions of the payments that represented interest, the repayments of the loan had no effect on petitioner's net worth.↩
8. Petitioner has cited portions of the transcript of the criminal trial to support some of her arguments. We have carefully reviewed those portions of the transcript, and we do not find that they significantly aid her case.↩
9. Petitioner offered no evidence to show reasonable cause for her failure to file an estimated tax return or her failure to pay estimated tax for 1951 to 1954, inclusive; nor does she contend on brief that she is not subject to the penalties determined for those years under sec. 294(d)(1)(A), I.R.C. 1939↩. Accordingly, we hold that petitioner is subject to such penalties for 1951, 1952, and 1954. In view of our conclusion that the assessment of deficiencies for 1953 is barred by limitations, no such penalties are applicable for that year.