HARRY T. KING, JR., and JOAN W. KING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
King v. Commissioner
Docket No. 6032-76.
United States Tax Court
T.C. Memo 1978-351; 1978 Tax Ct. Memo LEXIS 160; 37 T.C.M. (CCH) 1469; T.C.M. (RIA) 78351; September 7, 1978, Filed Matthew V. Byrne, Jr., for the petitioner. Barry J. Finkelstein, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: The respondent determined the following deficiencies in income tax and additions to tax: Addition to tax Year
Deficiency
[1] Section 6653(b) 1967
$ 9,698.14
$ 4,849.07
1968
23,851.40
11,925.70
1969
46,940.52
23,470.26
1970
8,667.93
4,333.97
1971
25,459.40
12,729.70
*161 The issues remaining for decision are: (1) whether petitioners had unreported taxable income during the years in question; (2) if so, whether any portion of such understatement of income was due to fraud; and (3) whether the deficiency for 1967 is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Petitioners resided in Oswego, New York, at the time the petition was filed herein. They timely filed their Federal income tax returns for each of the taxable years involved herein. For the years 1967 and 1968, their returns were filed with the district director of Internal Revenue at Buffalo, New York. For the years 1969 through 1971, the returns were filed with the Internal Revenue Service Center at Andover, Massachusetts. Harry T. King, Jr. (King) served in the United States Army from April 1943 until January 3, 1946. From the time of his discharge until 1960, he worked with his father in a family business. In 1960, the business, which was then conducted as a partnership, was incorporated as Harry T. King *162 Wholesale, Inc. (hereinafter referred to as "HTK"). During the years at issue, King was president of HTK, and devoted his full time to the business King's brother-in-law Earnest F. Mears (Mears) was secretary and treasurer of HTK and also devoted his full time to its business, and King owned 75 percent and Mears 25 percent of HTK's stock. HTK engaged in the distribution at the wholesale level of such consumer products as candy, confections, tobacco products, appliances, sporting goods, sporting firearms and ammunition. In addition, it sold a line of gifts and sundries, such as blankets, luggage, radios, hair dryers and watches, by means of a catalog. HTK uses a very simplified bookkeeping system in which some credit sales are recorded in an accounts receivable ledger while others are recorded on invoices which are physically placed on a spindle. Payments made on sales recorded in the ledger are eventually recorded in the ledger; payments made on spindle sales are noted on the copies of the invoices retained by HTK. [2] These invoices are then removed from the accounts receivable spindle and are usually stored. Neither a comprehensive credit sales journal nor permanent record *163 of all accounts receivable is kept. Upon completion of an audit of HTK in March 1972, the accounting firm of Ernst and Ernst issued the following statement: we were not able to examine the Company's sales and accounts receivable under generally accepted auditing standards. Because of the above limitations on the scope of our examination we were unable to express an opinion as to whether the accompanying financial statements present fairly either the financial position of Harry T. King Wholesale, Inc. at January 29, 1972, or the results of its operations and changes in financial position for the year then ended. Statements of similar import were included in the financial statements of HTK prepared by the accounting firm of Gilfoil and McNeal for the fiscal years 1968 and 1970. During the taxable years at issue, HTK received payments in currency *164 of at least $ 2,000 a week. A portion of this amount was used to pay employee salaries and wages, and an additional portion was deposited into bank accounts. King had access to such cash receipts. HTK reported its gross receipts and gross profits on its U.S. Corporation Income Tax returns as follows: Fiscal Year
Gross Receipts
Gross Profit
1967
$ 3,457,968
$ 159,413
1968
4,090,201
182,499
1969
4,642,154
192,653
1970
4,618,890
218,686
1971
4,853,198
197,655
1972
5,089,219
222,445 The corporate tax returns of HTK for the fiscal years 1967, 1968 and 1969 were not audited by the Internal Revenue Service. The returns for the fiscal years 1970, 1971 and 1972 were audited by the Internal Revenue Service and were accepted without change. Petitioners' bases in assets, liabilities and net worth as of December 31 for each of the years listed are as follows: 1966
1967
1968
ASSETS
Cash on hand
$ 26,719.54 $ 12,137.45 $ 7,725.37  Cash in banks
$ 37,378.15 $ 34,488.49 $ 40,451.89 Stock - HTK
90,000.00  90,000.00  90,000.00  Loans to HTK
248,164.60 268,164.21 319,164.11 Stock-American
Challenger Co.
Stock - Other
23,862.30  55,457.45  105,249.40 Real Estate
Old residence
25,000.00  25,000.00  25,000.00  Mortgage princi-
pal owed
New residence
6,000.00   Other land
15,000.00  Total
$ 451,124.59
$ 485,247.60
$ 608,590.77
LIABILITIES
Loans
$ 65,000.00 $ 65,000.00 $ 125,000.00
Total
$ 65,000.00 $ 65,000.00 $ 125,000.00
NET WORTH
$ 38l,124.59
$ 420,247.60
$ 483,590.77
Increase in
Net Worth
$ 34,123.01 $ 63,343.17 *165 1969
1970
1971
ASSETS
Cash on hand
$ 4,047.07  $ 2,618.34  $ 2,703.41  Cash in banks
$ 53,367.02 $ 77,743.75 $ 87,282.97 Stock - HTK
90,000.00  90,000.00  90,000.00  Loans to HTK
350,515.47 366,435.47 398,520.00 Stock-American
Challenger Co.
68,000.00  Stock - Other
124,335.49 135,871.50 116,299.26 Real Estate
Old residence
25,000.00  Mortgage princi-
pal owed
4,625.00   3,125.00   New residence
27,833.92  32,833.92  39,737.02  Other land
20,590.69  27,790.69  34,990.69  Total
$ 695,689.66
$ 737,918.67
$ 840,658.35
LIABILITIES
Loans
$ 133,807.61
$ 143,607.61
$ 187,029.91
Total
$ 133,807.61
$ 143,607.61
$ 187,029.91
NET WORTH
$ 561,882.05
$ 594,311.06
$ 653,628.44
Increase in
Net Worth
$ 78,291.28 $ 32,429.01 $ 59,317.38 The cash on hand figures included in the net worth computation are the amounts reported by petitioners in financial statements filed with Marine Midland Trust Company of Central New York. These statements represented petitioners' financial condition *166 as of the March 15 subsequent to each year involved herein. A portion of the stocks included in the net worth statement were registered in the names of the two sons of petitioner, David and Jeffrey, who were born on February 1, 1955, and April 6, 1962, respectively. During the taxable years at issue, petitioners borrowed substantial amounts and had loans owed to them by HTK. See net worth statement, p. 6, supra. The December 31, 1966, amount is attributable primarily to amounts owed to King from the partnership prior to incorporation (see p. 3, supra) as well as $ 53,429.00 in proceeds paid to King in 1963 as beneficiary on his father's life insurance by Metropolitan Life Insurance Company and in turn loaned to HTK. On September 5, 1969, King withdrew the dividends that had been accumulating on a life insurance policy from its issuance in 1950. The amount withdrawn was $ 9,199.96. On March 4, 1970, he withdrew additional accumulated dividends in the amount of $ 682.50. Petitioners incurred personal living expenses during the taxable years at issue of at least the following amounts: Year
Personal Living Expenses
1967
$ 16,069.74
1968
17,708.20
1969
23,764.28
1970
22,225.01
1971
29,116.33
*167 The computation of petitioners' adjusted gross income using the net worth method is as follows: 1967
1968
1969
1970
1971
Increase in
net worth
$ 34,123.01
$ 63,343.17
$ 78,291.28
$ 32,429.01
$ 59,317.38
ADJUSTMENTS
Additions: Personal Living
Expenditures
16,069.74
17,708.20
23,764.28
22,225.01
29,116.33
Nondeductible
Portion of
Capital Loss
0
0
3,113.79
0
0
Deductions: Nontaxable portion
of Capital Gain
0
1,358.83
0
0
554.00
Capital Loss
Carryover
0
0
0
1,000.00
1,000.00
Dividend Exclusion
100.00
100.45
100.00
100.00
100.00
TOTAL ADJUSTMENTS
15,969.74
16,248.92
26,778.07
21,125.01
27,462.33
CALCULATED ADJUSTED
GROSS INCOME
50,092.75
79,592.09
105,069.35
53,554.02
86,779.71
REPORTED ADJUSTED
GROSS INCOME
12,464.96
20,040.57
18,794.65
21,621.00
23,174.00
Unreported Income
37,627.79
59,551.52
86,274.70
31,933.02
63,605.71
The parties have stipulated that neither petitioner received any gifts, inheritances, bequests or (except as heretofore indicated) loans during the taxable years at issue. George F. Fitzgerald (Fitzgerald), an agent with the Intelligence Division of the *168 Internal Revenue Service, was assigned to petitioners' case on March 6, 1972. On May 17, 1972, Fitzgerald met with King. At this meeting, King was asked how much cash he might have at any given time. He indicated that he might have as much as $ 20,000 when he sold securities but that generally he would have $ 2,000 to $ 3,000. However, King was not asked how much cash he had on hand as of January 1, 1967, or January 1, 1968. On July 5, 1972, Fitzgerald met with Miles McNeil (McNeil), petitioners' accountant. Fitzgerald asked McNeil to prepare a net worth statement for the period starting January 1, 1968. Although King's statements concerning his cash holdings were discussed, McNeil did not indicate that King had a substantial cash hoard during the years under consideration. Henderson Booth (Booth), a revenue agent for the Internal Revenue Service, became involved in petitioners' case by January 1974. On January 28, 1974, Booth met with McNeil and two attorneys representing King, Thomas Hogan (Hogan) and Matthew Byrne, (Byrne). At this meeting, the preparation of a net worth computation was discussed, and Booth stated that his initial calculation indicated unreported income *169 of between $ 250,000 and $ 275,000. King's representatives stated that King had prohibited them from disclosing petitioners' cash on hand. Except with respect to the furnishing of information relating to his cash on hand, King's representatives generally cooperated with respondent's agents. On April 10, 1974, Booth met with King, McNeil, Hogan and Byrne. At this meeting, King for the first time stated that he had seized some diamonds from a German officer at the end of World War II and that, prior to the first taxable year at issue, he sold the diamonds for $ 285,000 in cash. King further stated at the meeting that he kept the cash for a number of years and used it to purchase securities and for other purposes during the taxable years at issue. Subsequently, Booth tried to obtain further details of this story. He requested that King provide such details in writing, in the form of an affidavit or orally at a conference. The requested information was never provided. In the notice of deficiency, respondent determined that, because of inadequate records, it was necessary to compute petitioners' income by use of the net worth method, which calculation resulted in the deficiencies *170 involved herein. He further determined that all or part of the underpayment of the tax was due to fraud. ULTIMATE FINDINGS OF FACT Petitioners did not have cash on hand in any of the taxable years at issue in excess of the amounts shown in the net worth calculations on page 6, supra. HTK cash sales provided a likely source of unreported income to King. Petitioners had unreported income in the following amounts and for the years specified: 1967
$ 37,627.79
1968
59,551.52
1969
86,274.70
1970
31,933.02
1971
63,605.71
At least part of the deficiency for each of these years is due to fraud. OPINION This is a net worth case. The right of respondent to use the net worth method of reconstructing income is unquestioned, if only as a means of testing the accuracy of a taxpayer's books and records. See concurring opinions of Raum, J., and Dawson, J., in Bushnell v. Commissioner,49 T.C. 296, 310-312 (1967), subscribed to by a majority of this Court. This does not mean that respondent's use of the net worth method is not open to attack. [3]Holland v. United States,348 U.S. 121 (1954); Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971), *171 affg.T.C. Memo. 1970-144; Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). The question herein relates to the validity of the various bases of the attack by petitioners herein. The main thrust of petitioners' attack is grounded upon the assertion that they were not credited with some $ 285,000 in cash which King claims he had on hand and expended during the taxable years in issue, thereby accounting for any alleged unreported income during those years. King testified that, while stationed in Czechoslovakia at the end of World War II, he and an associate stopped a German *172 officer and took from him some weapons and a leather pouch, which King later discovered was full of cut, but unmounted, diamonds. According to King, some of the diamonds were tiny, but some would "have made good stones for a slingshot." As his story goes, he kept the diamonds until 1964, when he arranged for Rosse Marchione, an associate in the tobacco business, to sell them. King claims to have received $ 285,000 in cash from the sale, which he allegedly kept in numerous business and personal safes until 1967, when he began using the cash to make investments. Albert Laurin testified that he served in the armed forces during World War II and that he met King while they were stationed in Czechoslovakia in 1945. He testified that on two separate occasions during 1945 he saw King with three or four diamonds in his possession; in each instance, King had run short of money in a crap game and used the diamonds to continue gambling. John Crisafulli, who is in the retail sporting goods business and has been a customer of HTK for many years, testified that once, while in King's office during the early 1960s, he mentioned that he was interested in purchasing "a nice diamond" for his *173 wife and that at a later date King showed him between 15 and 20 diamonds, each of which Crisafulli believed to be in excess of one carat in size. Although the testimony of Laurin and Crisafulli tends to support King's story, it fails to corroborate to any significant extent what we view as the crucial elements of his tale, i.e., the number of diamonds involved, the amount received for the diamonds, and the maintenance of the proceeds in cash until the taxable years at issue. Moreover, testimony from King's long-time friends and associates need not be accepted, even if not directly contradicted. See Gatling v. Commissioner,286 F.2d 139, 142-143 (4th Cir. 1961), affg.T.C. Memo. 1959-224; Imburgia v. Commissioner,22 T.C. 1002, 1017-1018 (1954). Accordingly, we give this testimony little weight, both for its lack of probative value on the crucial factual questions and because of the potential bias of the witnesses. The evidence, both direct and circumstantial, indicating the absence of a cash hoard is substantial and provides a convincing basis for concluding that no cash hoard existed. Initially, we note that King told Fitzgerald in May 1972 *174 that he might have as much as $ 20,000 in cash when he sold securities but that generally he would have between $ 2,000 and $ 3,000 on hand. Petitioners have provided no explanation for this statement. Also unexplained are the modest amounts listed by petitioners as cash on hand (excluding cash in banks) in financial statements prepared for the Marine Midland Trust Company of Central New York in March or April of each year from 1966 to 1972. The largest figure was $ 26,719.54 reported as of March 15, 1967. In addition, petitioners increased their borrowings during the period in which they claimed their substantial cash hoard. Although businessmen often borrow money when they do not need to in an absolute business sense (see Estate of Mercure v. Commissioner,T.C. Memo 1969-206, affd. 448 F.2d 922 (6th Cir. 1971)), in the context of this case and absent any explanation in the record, we think that such borrowings have a bearing on our evaluation of King's story. We also think that the long period of time during which King claims he held the diamonds and the absence of any evidentiary details to support the amount and timing of the expenditure of *175 the alleged $ 285,000 proceeds of sale (information clearly within King's possession or recollection) undermines the assertion that the claimed cash hoard continued to exist intact until the end of 1966. [4]
Also casting doubt on King's testimony are the events surrounding King's initial presentation of the diamond story. Prior to April 10, 1974, King had instructed his representatives not to discuss his cash on hand in conversations concerning his net worth. Only after respondent's agent disclosed his initial estimate of unreported income did petitioner reveal the purported existence and size of his cash *176 hoard. King's cash hoard story, first told after his representatives were informed that respondent's net worth calculations revealed substantial unreported income, is a transparent attempt to change the rules after respondent's cards had been played. We recognize that the situation which King described relating to his claimed acquisition of the diamonds may well be of a type which occurs in time of war. [5] Nonetheless, under all the circumstances, based upon our evaluation of the entire record and of the testimony of the witnesses whom we saw and heard, we view King's story as incredible, and not worthy of belief. See Anderson v. Commissioner,250 F.2d 242 (5th Cir. 1957), affg.T.C. Memo. 1956-178; Carmack v. Commissioner,183 F.2d 1 (5th Cir. 1950), affg. a Memorandum Opinion of this Court. We hold, not merely that petitioners have failed to carry their burden of proof as to the underlying deficiencies (see Rule 142(a), Tax Court Rules of Practice and Procedure), but that the evidence clearly and convincingly *177 establishes that in fact King did not have cash on hand, during the taxable years at issue, in excess of the amount determined in the net worth calculations set forth in our findings of fact. We are satisfied that he accurately stated his cash on hand in his financial statements and in his early discussion with Fitzgerald, the amounts of which are reflected in those calculations. These consistent statements were made in circumstances in which there was no incentive to understate the cash figures. [6] See Epstein v. United States,246 F.2d 563, 569-570 (6th Cir. 1957). Petitioners next seek solace in the contention that respondent has failed to identify a likely source of unreported income. As a substantive matter, such assertion simply does not comport with the record herein. There is ample evidence that HTK had receipts of at least $ 100,000 in cash annually during the taxable years at issue and that King, as well as Mears, *178 had access to such cash. Petitioners' other grounds for claiming that the business was not a likely source are rejected. It is clear from our findings that HTK's books and records were incomplete and kept in such a manner as to preclude an effective audit. See p. 4, supra. Under these circumstances, the fact that respondent accepted HTK's returns for three taxable periods is entitled to little weight. At most, such acceptance stands for no more than that the books and records, which the revenue agents saw during the audit, were consistent with the returns as filed. But it has long been established that consistency is not to be equated with truthfulness. See Holland v. United States,348 U.S. at 132; Estate of Mazzoni v. Commissioner,supra;Thomas v. Commissioner,223 F.2d 83, 86 (6th Cir. 1955), rev'g. on other groundsT.C. Memo. 1956-185. See also, United States v. Costanzo,    F. 2d    (2d Cir. 1978). Nor is the testimony of petitioners' accountants as to profit margins entitled to much weight. Admittedly, reported gross profit as a percentage of sales varied by less than one percent from year to year *179 (a low of 4.07 percent and a high of 4.73 percent). A comparable, although somewhat higher, narrow margin of variation continues to obtain if all of the increases in net worth are assumed to represent skimming of HTK's sales and are added to HTK's reported sales figures (a low of 4.70 percent and a high of 6.43 percent). [7] But more important than the foregoing comparison is that such procedure increases the profit margin by a minimum of almost 3/4 of one percent and a maximum of approximately 1-1/4 percent. Such higher percentages are still within the range of reasonably expected profits from a business of the type conducted by HTK, with the result that the business as a likely source of unreported income to King cannot be said to have been negated. *180 Moreover, in determining the existence of a likely source, respondent need go no further in satisfying any burden of proof he may have (see p. 26, infra) than to negate all nontaxable sources that could account for the increase in net worth. United States v. Massei,355 U.S. 595 (1958); Foster v. Commissioner,487 F.2d 902, 903 (6th Cir. 1973), affg.T.C. Memo. 1972-188; Kramer v. Commissioner,389 F.2d 236 (7th Cir. 1968), affg.T.C. Memo. 1966-234. It is stipulated that petitioners did not receive any gifts, inheritances, bequests, or loans that were not taken into account in the net worth computations. The only nontaxable source suggested by petitioners is their alleged cash hoard. Because we have found that, on December 31, 1966, petitioners did not possess cash in excess of the amount allowed by respondent (see p. 19, supra), we conclude that respondent has negated the existence of any nontaxable sources. See Gatling v. Commissioner,supra.
In view of the foregoing, and on the basis of the entire record herein, we are satisfied that a likely source of income taxable to King has been clearly and *181 convincingly established with respect to each of the years at issue. Petitioners further seek to discredit the net worth calculations by charging that respondent did not investigate the leads as to the alleged cash hoard. We dismiss this assertion as being totally without merit. Initially, we note that, after the April 10, 1974, meeting at which King first presented his story, Booth attempted to obtain further details, which were never provided. Respondent was not given any names or specific details which could be investigated. Because petitioners prevented respondent from pursuing a meaningful investigation of the best source of information, i.e., King, the responsibility for any failure to investigate must rest at petitioners' own doorstep. Moreover, the only non-testifying individuals who could have corroborated petitioner's story were deceased by 1974. See footnote 4, supra. In any event, the fact is that respondent is not required to investigate leads. He may, if he chooses, fail to do so and run the risk that "the trial judge may consider them [the leads] as true and the Government's case insufficient." (Emphasis added.) See Holland v. United States,348 U.S. at 136. *182 Moreover, the presence of a "likely source" of taxable income tempers the need to negate other potential nontaxable sources of net worth increases. See United States v. Massei,supra;Shahadi v. Commissioner,266 F.2d 495, 500 (3rd Cir. 1959), affg. 29 T.C. 1157 (1958).
The other disputed item in respondent's net worth statement relates to the American Challenger stock. It is stipulated that petitioners had an investment in stock of this corporation of $ 68,000. King testified that $ 7,000 of the amount paid for this stock was provided by two other individuals and that the shares purchased with the $ 7,000 were held by petitioners for their benefit. The purported reason for structuring the purchase in this manner was to enable the other parties to acquire the stock despite limitations imposed on the sale as a result of its being a private placement. Aside from King's testimony, petitioners provided no corroborating evidence in this regard. In light of the stipulation that petitioners owned American Challenger stock costing $ 68,000, we hold that petitioners failed to establish that they were the owners of a lesser amount of *183 the stock. Having disposed of the specifics of petitioners' attack on the respondent's net worth statement and the increases in taxable income claimed therein, we think there is little more that need be said in disposing of the issues which require our decision. First, clearly petitioners have failed to satisfy their burden of proof as to the underlying deficiencies as required by Rule 142, Tax Court Rules of Practice and Procedure.
Second, as to the additions to tax herein, we recognize that respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Rules of Practice and Procedure of this Court; Foster v. Commissioner,supra; Green v. Commissioner,66 T.C. 538, 549 (1976). Fraud will not be imputed or implied and mere suspicion of fraud is insufficient. Estate of Mazzoni v. Commissioner, supra;Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). And this precludes a finding of fraud based simply on the petitioners' failure to carry their burden of proof that they did not have unreported income as shown in respondent's net worth calculations. Nevertheless, since fraud *184 can seldom be established by direct proof, it may be based upon circumstantial evidence and reasonable inferences drawn from the evidence. See Stone v. Commissioner,56 T.C. 213, 224 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Estate of Mazzoni v. Commissioner,supra.[8] We have kept these admonitions carefully in mind and we have concluded that respondent has carried his burden. The key to our decision lies in our holding that the record clearly and convincingly establishes that the cash sales of HTK were a likely source of unreported income of King and that no cash hoard, as claimed by petitioners, existed, with the result that petitioners in fact did not have cash on hand at the beginning of any of the taxable years at issue in excess of that shown in the net worth calculations set forth in our findings of fact. Such holdings inexorably produce the conclusion -- clearly and convincingly -- that petitioners had unreported income in each of the years at issue. Such systematic unreporting of income can be persuasive evidence of fraud. *185 Kramer v. Commissioner,389 F.2d at 239; Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3rd Cir. 1957), affg.T.C. Memo. 1956-155; Estate of Hill v. Commissioner,59 T.C. 846, 855-856 (1973); Harper v. Commissioner,54 T.C. 1121, 1139 (1970). In the context of our affirmative findings as to unreported income, the financial statements which petitioners filed with their bank provide further indicia of fraud. The financial statement filed as of March 15, 1968, revealed an increase in petitioners' net worth from the prior year in excess of $ 30,000; petitioners' income tax return for the year 1967, signed by petitioners less than one month thereafter, reported gross income of less than $ 13,000. The financial statement filed May 20, 1969, revealed an increase in net worth in excess of $ 90,000; petitioners' tax return for the year 1968, reported gross income of approximately $ 20,000. We are satisfied that petitioners were aware from these financial statements that they had some income which should have been but was not included in their 1967 and 1968 returns. [9] See Romm v. Commissioner,245 F.2d 730, 734 (4th Cir. 1957), *186 affd. on this issueT.C. Memo. 1956-104.
Finally, we think King's fabrication of the diamond story is further evidence of fraud. After initially claiming relatively modest cash holdings, King instructed his representatives not to discuss the matter with respondent's agents. Not until King obtained respondent's estimate of unreported income did he present his diamond story. Such behavior is indicative of fraud. See Estate of Mazzoni v. Commissioner,supra,451 F.2d at 202. [10]
We think the record herein clearly and convincingly reveals that King received income in each of the years at issue which petitioners intentionally did not report *187 although they knew such income to be taxable. Gajewski v. Commissioner,67 T.C. 181, 199-200 (1976), affd. per curiam     F.2d     (8th Cir. 1978). We hold that respondent has satisfied his burden of proof that at least part of petitioners' understatement of income was due to fraud for each of the years at issue. Our decision on the fraud issue disposes of petitioners' argument that assessment of the deficiency for 1967 is barred by the statute of limitations. Section 6501(c)(2). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. The record indicates that spindle sales invoices are normally paid within seven days, are handled as indicated, and are not posted to the accounts receivable ledger, but it is unclear what happens to such invoices which are not so paid. Presumably, the latter category eventually finds its way into the accounts receivable ledger.↩
3. We note that, with the exception of the amounts of cash on hand with which petitioners should be credited and a question as to the amount of American Challenger stock King owned, all of the elements of the net worth statement have been stipulated by the parties. This fact minimizes many of the vagaries which inhere in the net worth computation. See Holland v. United States,348 U.S. 121, 127-129 (1954); Foster v. Commissioner,T.C. Memo 1972-188, affd. per curiam 487 F.2d 902↩ (6th Cir. 1973).
4. We have taken into account the fact that the death of two persons (one who was with King at the time he purportedly acquired the diamonds and Marchione, who allegedly accomplished the sale) presented difficulties of proof on the part of petitioners. But against this, we are constrained to note that, despite any inhibitions which King might have had, in the earlier years, about any sale of the diamonds, we think that these inhibitions should have disappeared long before 1964. Moreover, by this time, any inhibitions about documenting the sale should also have disappeared.↩
5. Cf. Rose v. Commissioner,T.C. Memo. 1974-91; Turzynski v. Commissioner,T.C. Memo. 1972-136↩.
6. Petitioners claim that such financial statements understated their assets, because there was no need to show the banks any larger net worth, is completely contrary to the posture which a prospective borrower would be likely to adopt.↩
7. HTK's gross sales and gross profits as reported in its U.S. Corporation Income Tax returns and the rates of gross profit to gross sales are as follows: Gross Profits Fiscal Year
Gross Sales
Gross Profits
Gross Sales
1968
$ 4,090,201
$ 182,499
4.46%
1969
4,642,154
192,653
4.15%
1970
4,618,890
218,686
4.73%
1971
4,853,198
197,655
4.07%
1972
5,089,219
222,445
4.37%
If the amounts which we have found to be unreported income represent unrecorded sales of HTK in its fiscal year ending shortly after the close of the applicable calendar year, then the "true" gross sales and gross profits and the ratios of these amounts would be as follows: Gross Profits Fiscal Year
Gross Sales
Gross Profits
Gross Sales
1968
$ 4,127,828
$ 220,127
5.33%
1969
4,701,806
252,305
5.36%
1970
4,705,165
304,961
6.48%
1971
4,885,131
229,588
4.70%
1972
5,152,825
286,051
5.55%
We recognize that the accuracy of the profits/sales ratio so calculated is to some extent dependent upon the assumption that the calendar year and fiscal year figures can be mixed in the above manner. We are confident that no significant distortion results from the method used above.↩
8. See also Sporck v. Commissioner,T.C. Memo. 1978-79↩.
9. The financial statements for the following three years indicate virtually no increase in petitioners' net worth. It appears that at least a portion of the discrepancy between the net worth as reported on these financial statements and as calculated is due to the substantial increase in the amount of petitioners' stock registered in their children's names.↩
10. See also Yellow Cab & Car Rental Co. v. Commissioner,T.C. Memo. 1974-79; Whitfield v. Commissioner,T.C. Memo. 1972-139↩.