Lewis Thurston **ANDERSON** and Clyde Velma Anderson, Lewis Thurston Anderson, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 16624.

United States Court of Appeals Fifth Circuit.

Dec. 6, 1957.

Rehearing Denied Dec. 30, 1957.

L. Eugene McNatt, Atlanta, Ga., Thomas R. Spillane, Savannah, Ga., Cuba, Cuba & McNatt, Atlanta, Ga., of counsel, for petitioners.

Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, Atty., John N. Stull, Acting Asst. Atty. Gen., Nelson P. Rose, Chief Counsel, Int. Rev. Service, Rollin H. Transue, Special Atty., Washington, D. C., Lee A. Jackson, Harry Baum, Melvin L. Lebow, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This petition for review of a decision of the Tax Court in these consolidated cases involving income tax liability for the years 1942 through 1948, and certain additions to the tax for several of the years, presents primarily a series of fact issues. These are whether the deficiencies ascertained by the increase in net worth method of computation are supported in fact by the record, whether the assessment of the fraud penalty for some of the years was justified and whether the determination that the failure to file a return for 1947 was due to wilful neglect rather than reasonable cause is clearly erroneous.

Other questions involving mixed issues of law and fact or law alone must also be disposed of.

Briefly stated, the taxpayer was engaged during the years 1942 through 1946 as a watchmaker as he had been for many years previously. He worked for wages varying from $55 to $70 per week. He filed income tax returns for all the years in issue except for 1947. Beginning long prior to the tax years taxpayer had begun acquiring small properties consisting principally of cheap residental property which he kept up largely himself and rented to tenants of low income groups. He continued to acquire land and houses and to build

small poorly constructed dwellings both for rent and for sale during certain of the tax years. He also acquired some farm acreage and timber lands. Towards the end of the period (from 1945 to 1948) his holdings in securities increased from $10,369.81 to $26,436.00. He owned security deeds secured by real estate sold by him on small or no down payment and for small monthly payments in the following face amounts for the years in issue:[1] 1942, $4,863.62; 1943, $6,440.51; 1944, $6,587.15; 1945, $43,-795.64; 1946, $58,907.48; 1947, $127,-562.28; 1948, $165,899.92. During the same period his ownership of land at cost was as follows:

| | |
|---|---|
| 1942 | $69,929.77 |
| 1943 | 71,578.80 |
| 1944 | 88,486.30 |
| 1945 | 61,348.52 |
| 1946 | 48,150.34 |
| 1947 | 38,737.78 |
| 1948 | 36,523.89 |

The taxpayer's cash on hand and other assets increased moderately, as did his indebtedness.

It was apparent from the most cursory search that there was a substantial increase in taxpayer's net worth during the period that was not reflected in the annual returns filed by him.

The taxpayer kept no books of account from which his income could be even approximated. He did much of his dealings in cash and destroyed all cancelled checks. The investigation of the seven years commenced with a conference with revenue agents in June 1947, when they were investigating his 1944 return. At this time, on request of the agents for records of income and expenses he furnished them with three notebooks one of which purports to contain records of sales from 1943 to 1945, another bore the caption "Income Tax Book—1944," and the third has written on the cover "1946 to * * *." Two of three books are in evidence and contain entries concerning sales of numerous parcels of real estate. The entries include the names of the purchaser, the street name and house number of the property, the amount of the loan and payments made by the purchaser. In some instances a cost figure is shown; in others it is not. The book captioned "Income Tax Book—1944" is not in evidence. The agents made a transcript of the books and returned them to the taxpayer on January 30, 1948. The taxpayer informed the revenue agents that he had no records other than the books he gave to them. Actually on the trial he produced three other books which were also inadequate.

The taxpayer was a man of considerable frugality. He was married and had a daughter living with him. He convinced the Tax Court that his personal living expenses (added to the annual increase in net worth) were only $1,000 per year for himself, wife and daughter.

The petitioner's first attack on the finding of the Tax Court is based on his contention that the Commissioner made arbitrary determinations of increases in net worth that were demonstrated by subsequent findings of the Tax Court to be so unreliable as to withdraw from the determinations all presumption of correctness. The chief fallacy of this contention lies in the major premise. The determinations made by the Commissioner were neither arbitrary nor unreasonable under the circumstances of the investigation. The agents made a long and painstaking investigation of taxpayer's income. They were frustrated in their efforts to check the correctness of his returns by a complete absence of any system of accounting and a complete absence of records or supporting documents. As we said in Bryan v. Commissioner of Internal Revenue, 5 Cir., 209 F.2d 822, 827:

"When a taxpayer violates the mandate of the statute which re-

---

1. The reasonable value of these notes will be discussed below.

quires him to keep proper records of his income, [26 U.S.C.A. § 54(a)] and conditions are otherwise such that his taxable income may be determined in retrospect only by resort to circumstantial evidence of this character, he will not be permitted to rely upon his ability to conceal the detailed facts of his income and his fraudulent conduct to avoid the imposition of taxes which the collecting authorities may show to be lawfully due."

Here resort was had to the Banks in which taxpayer had accounts, to the real estate records, dealers who furnished supplies, purchasers of houses and brokers' offices; the taxpayer, his mother and his sister were repeatedly questioned; copies of his own financial statements were checked against original mortgages and security deeds. In point of fact, the only substantial errors demonstrated in the Commissioner's determination stem either from misinformation given by the taxpayer or by his mother or sister, except as to the value to be attributed to certain promissory notes owned by petitioner secured by real estate he sold. As to this item the agents took the full amount of the notes, which was neither arbitrary nor without support even though the Tax Court later found that 70 percent of the fact of these notes was the correct value. It was not arbitrary for the agents to consider as worth face value notes which the taxpayer had exacted when he sold the various parcels of real estate, and which he was currently collecting according to their terms, including interest of from 5 to 8 percent. The fact that at the hearing before the Tax Court credible evidence was adduced by petitioner for the first time to show that these notes were not worth full face value does not detract from the presumption of correctness that attaches to the Commissioner's other reasonably founded determinations.

This is the normal office of such a presumption. It merely throws on the taxpayer the burden of showing with respect to each item that the Commissioner was wrong. Goldberg v. Commissioner of Internal Revenue, 5 Cir., 239 F.2d 316, 319. The fact that he carried that burden with respect to the value of the notes and the inclusion of certain assets which belonged to the petitioner's mother and sister, does not destroy the presumption of correctness of the remaining determinations by the Commissioner which are not shown by the taxpayer to be wrong.

Moreover, substantially all of the increases in net worth determined by the Tax Court were supported by affirmative evidence, much of which was in the nature of financial statements made by the taxpayer to the banks during the successive years. The Tax Court's opinion indicates a most painstaking effort to sift the evidence as to the specific pieces of property held at various dates. Whenever any evidence was introduced that cast any substantial doubt on the accuracy of the agent's report that Court readily accepted such proof in favor of the taxpayer.

Petitioner next attacks several specific findings of the Tax Court as being without evidence to support them. The three important findings are: 1. That taxpayer's claim that he had $20,000 to $22,000 in cash hidden in glass jars in the woods on the opening date of the tax period was not credible; 2. That taxpayer's contention that on the closing date taxpayer had an additional liability in the form of two notes for $85,000 to one Senn was not credible; 3. That the secured real estate notes of taxpayer were worth 70 percent of face value.

We need not dwell long on the story of the hidden cache of money. Aside from being a story that would strain the credulity of any reasonable trier of the facts,[2] the Tax Court had

---

2. Taxpayer said he put money in glass jars and buried them in the woods where he went dressed as a hunter; that no one but he knew where they were buried;

before it sufficient other evidence to warrant its rejection of taxpayer's uncorroborated story. Boyett v. Commissioner of Internal Revenue, 5 Cir., 204 F.2d 205; Archer v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 270; Kite v. Commissioner of Internal Revenue, 5 Cir., 217 F.2d 585. His income record, as disclosed by his tax returns, would not account for the saving of such an amount by January 1, 1942; the claimed cash was not included on financial statements furnished by taxpayer to the banks to establish credit as of January 1, 1942, or any subsequent statement; he was borrowing money at substantial rates of interest at the time he claims to have had this cache, such conduct being entirely inconsistent with the frugal nature demonstrated by taxpayer; there was no positive affirmative testimony as to the amount he claimed was in the jars at the opening date or how much he ad-

mitted was still there at the closing date. In light of all of these circumstances the Tax Court was not bound to accept the uncorroborated, implausible, incoherent contention of the taxpayer as to the existence of the hidden money.

■■ Precisely the same answer can be given to the petitioner's contention that the Tax Court erred in not believing his story that his net worth as of December 31, 1946, 1947 and 1948 should be reduced by an amount of $85,000 allegedly owed one E. R. Senn. One of the important functions of the Tax Court, as trier of the facts, is to pass on the credibility of the taxpayer as his own witness. The Court is not required to accept as true every statement made by the taxpayer even if uncontradicted. If testimony is inherently so implausible or improbable as to stretch the credulity of the Court [3] it can decline to believe

that he put money in and took it out without knowing at any time how much was there; that some of the money in the jars was cash from his father's estate, although elsewhere his proof shows that he received no cash from this estate; that he put the money in the ground because he didn't trust the banks (although he did have several bank accounts); later in his testimony he said he buried it because he had an "itty-bitty" safety deposit box and kept his securities there. He did not testify as to how many jars he had buried, but stated that even down to the date of the the trial he had a couple of jars still buried in the woods, although he did not know how much was in them. He did not take the agents to the hiding places or show them these jars, and of course their contents were not counted against him in the closing net worth computation.

3. This testimony is just short of fantastic: The taxpayer knew a man named Senn— all he knew about him was "just Mr. Senn is all I know." Initially, he thought he knew Senn for several years, but later said he knew him for ten or twelve years, during which time Senn lived in Augusta. Senn left Augusta some time after 1947. (The Commissioner's agents searched the city directory of Augusta for the years 1940 through to the date of hearing below, and looked in the Tax

Digest for Augusta, and inquired around Augusta, but no trace of Senn could be found.) The taxpayer could not remember when he met Senn, but recalled that he lived in a rooming house that no longer existed; he did not remember the landlady's name. The taxpayer met Senn through a mutual friend who was no longer alive. Senn had no family in Augusta. Senn never worked while he was in Augusta, but he carried around a hoard of money in a suitcase because he did not like banks. However, in 1946 Senn loaned the taxpayer $55,000 and in 1947 he loaned the taxpayer an additional $30,000. The taxpayer borrowed the money because he thought he needed it; he buried the money—$85,000 at 4% interest—after he received it. However, before he buried the second loan of $30,000 he kept it for a time under some building supplies in a shop near his house. These loans were transacted in the woods and each time Senn brought along a suitcase full of money—they sat down and counted it. Senn took no security or collateral for the loan. There were two notes introduced in evidence which were the kind the taxpayer kept around the house. Both notes bear undated indorsements which read, "Paid— E. R. Senn." (no evidence was introduced to prove the signature of Senn.) The notes bore 4% interest. The $55,-000 loan was allegedly received by the

it if the taxpayer's credibility is already before the Court. Here the disbelieved tale about the money in glass jars added nothing to the credibility of this witness. However, it cannot be said that Anderson's testimony was unimpeached on the Senn note. He furnished financial statements to the banks as of December, 1946, 1947 and 1948, purporting to give his assets and liabilities. No such liability as this was included in any of these statements. He thus impeached his own testimony. Furthermore his testimony, if believed, was not sufficient to prove that he did not have a substantial part of the proceeds of the loans still buried at the end of each of the years in question, as he testified only that he buried it and removed it as he needed it. The Tax Court was not clearly in error in refusing to accept the taxpayer's contention that he had this outstanding liability.

We come next to the court's ascertainment of a 70 percent value of the notes secured by the security deeds owed by the taxpayer. Although we have stated that it was not arbitrary for the Commissioner to determine that the notes representing the sales price of houses had a value equal to their face, since taxpayer was currently collecting them, we find sub-

stantial evidence in the record of the trial that would support a value of a figure somewhat less than face. The value of these notes, of course, had a definite bearing on the annual discrepancies between reported and actual income of the taxpayer, since he must account for cash or property at its fair value if a sale or exchange was made of the real estate owned by him.

The taxpayer strenuously contends for a valuation of 30 percent, or at the most of 56 percent, on the basis of opinion evidence. Several witnesses testified that the houses that stood as security for the notes were shoddily built; that they lacked plumbing; they were in an undesirable neighborhood; that their values averaged about 56 percent of the face amount of the notes. The taxpayer testified that he sought no deficiency judgment if a purchaser defaulted.[4] One witness gave it as his opinion that the notes had a fair value of 30 cents on the dollar.

On the contrary the Commissioner points out the following facts in the record to support the Tax Court's finding of a value of 70 percent of face value; the testimony of petitioner's witnesses establishing a value of the security at 56 percent; the shortage of houses and the

taxpayer in April, 1946; he buried it but removed it as he needed it. Yet, at the end of 1946 he had loans outstanding drawing interest against him of $12,391.92 and owed money on building supplies in the amount of $2,832.18. After the second loan Senn left town and never communicated with the taxpayer. However, the taxpayer, a few years later (he did not recall the date) went to Florida and looked Senn up in Miami. He paid Senn some of the money he owed him in the rooming house where he found him, but did not recall where the rooming house was located. In order to pay Senn, the taxpayer sold his securities and dug up all the money he could find. (He later testified that he obtained the money to pay Senn from a bank and, therefore, did not know how old the bills were which he used for payment.) At the time of the hearing, he did not owe Senn any more money because Senn for-

gave him the interest. (The taxpayer subsequently testified that he still owed Senn the interest.) None of the taxpayer's records give any indication of the purported debt and in none of his financial statements to the banks is there any statement that he owed this amount. The taxpayer did not bring Senn to the hearing below and did not produce any witnesses who knew Senn.

4. However petitioner does not call our attention to any testimony that he ever lost so much as a dollar of the sales price represented by the notes. He testified that rather than go through a formal foreclosure he frequently found a new purchaser who simply took over from the original maker of the notes, presumably, from taxpayer's testimony, taking on the obligation to pay the monthly notes.

great demand existing at the time in question; houses were located near mills and army camps; the notes were being currently paid off and the payments included substantial interest payments. The Commissioner also calls attention to the fact that the one witness who testified to the 30 percent valuation had no actual experience in the purchase or sale of mortgage paper and was not in Augusta or its vicinity during several of the years in question, thus challenging the weight required to be placed by the Tax Court on his opinion.

■ Valuation is, of course, a question of fact. It is necessarily an approximation arrived at by the trial court on such factors as reasonably bear on determining the price which would reasonably be paid by the hypothetical willing purchaser to the equally hypothetical willing seller who is under no compulsion to sell. It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence. Archer v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 270, 273. Cf. Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 5 Cir., 192 F.2d 633, 635. In the determination the Tax Court should consider all the factors, and when its finding has a basis in the record taken as a whole its determination is considered as final on appeal. Mistrot v. Commissioner of Internal Revenue, 5 Cir., 84 F.2d 545, 546. Of course, opinion evidence is admissible and relevant on the question of value, but it may be given just such weight as the Tax Court may consider it worth in light of the demonstrated qualifications of the expert and when considered with the other evidence of value. It is clear that the court here gave some weight to the testimony of the

one expert who gave an opinion of value; otherwise the court would have had no basis for fixing a value of less than 100 percent of the face of the notes. We cannot say that it should have given more or less weight than it did in view of the other circumstances such as the current collectibility of the notes, the shortage of houses during the years in question and the fact that the taxpayer had himself exacted promises to pay these several amounts as the purchase price for the houses during the very years in question, a fact that is certainly of evidentiary value. It was the Tax Court's duty to weigh the evidence and draw the inferences from the facts and declare the value. We cannot say that its valuation at 70 percent of the face amount of the notes was clearly erroneous.

■ Petitioner's contention that there was no support for the Tax Court's finding of a substantial amount of investment in 1946 for houses under construction cannot prevail. There was a careful investigation by the agents as to the date of acquisition of the many properties owned by taxpayer and, based largely on his ownership in 1947 and 1948 of newly constructed houses, they determined that at December 31, 1946 he had $48,000 in finished and partially finished construction. This determination of the Commissioner was not arbitrary or unreasonable and the taxpayer had the burden of disproving it. He made no effort to do so. In fact, the agent testified that when he explained the item to Anderson he did not object to it.[5]

■ We next come to the important fraud issue. Of course the courts have repeatedly held that the mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case. Bryan v. Commissioner of Internal Revenue, 5 Cir., 209 F.

---

5. "Q. Mr. Anderson was satisfied with those figures at the time was he not?

"A. He was to the extent he didn't raise any objection to it when we asked him whether or not this was the amount, and he went along with it."

2d 822; Goldberg v. Commissioner of Internal Revenue, 5 Cir., 239 F.2d 316, 320. However, repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud. The attitude and testimony of the taxpayer as a witness at the trial may, of course, be considered by the court in determining how much weight is to be given to his testimony. Here the fact that the court rejected as fabricated the taxpayer's testimony both as to the hidden glass jars of money at the opening date and the two notes to E. R. Senn at the closing date may well have caused the court to look with an exceedingly dim view on the explanation offered by Anderson and his motives and intent in failing to keep books, in transacting most of his business by cash and in destroying cancelled checks.[6] We think this case falls well within the reasoning of the court in Bryan v. Commissioner of Internal Revenue:

> " * * * As a general rule, the mere failure to report income, considered alone, is insufficient to establish fraudulent intent. However, each case must be considered in the light of its own particular facts. Thus considering the present case, we do not hesitate to affirm the finding of the Tax Court. The taxpayer maintained partial records of his income from one or more of his enterprises, but at the same time he maintained no records at all of other sources of income. This method of bookkeeping is designed to conceal the true facts concerning taxable income. For a period extending over eight years he habitually reported only a portion of his income and, during the years under review, only a small fraction of such income.

This course of conduct on the part of the taxpayer over such an extended period of time warrants the finding that the false returns were filed with the intent to evade tax." Bryan v. Commissioner of Internal Revenue, 5 Cir., 209 F.2d 822, 828.

We conclude that the finding by the Tax Court that part of the deficiencies for the years 1942, 1943, 1945 and 1946 was due to fraud was not clearly erroneous.

The conclusion of the fraud issue, as conceded by the petitioner, answers his contention as to liability for 1942 and 1943, and the application of Section 6 of the Current Tax Payment Act of 1943, both of which issues must be decided adversely to petitioner.

We have considered the other contentions of the petitioner, both as to the treatment of sales of houses as being sales of property held primarily for sale to customers and as to denial of the installment sales treatment in the sale of some of the properties, but do not find that the Tax Court erred in its decision as to these issues. So too as to the remaining questions presented by petitioner on brief. We have considered each of these contentions but find them without merit.

It appears that mathematical errors have occurred in the computations of the Tax Court. In order that the taxpayer's interests may be fully protected against such errors, it is ordered that the Tax Court's decision is Affirmed in all particulars except as to the computations of the income and tax thereon. For a correct determination of these matters the case is Remanded to the Tax Court.

HUTCHESON, Chief Judge (concurring in part and dissenting in part)

I concur in most of what is said in the opinion of the majority and in its affirmance of the Tax Court's decision,

6. For a case in which the court comments on the taxpayer's "questionable testimony" as being an element of proof of fraud, see Bond v. Commissioner of Internal Revenue, 4 Cir., 232 F.2d 822.

except (1) as to the fair market value of the security deeds, and (2) as to the capital gains issue. I agree, too, with the rejection by the majority of the petitioners' contention that the determinations of increases in petitioners' net worth were so arbitrary and unreliable as to withdraw from the determinations all presumption of correctness.

I disagree, however, with the reason given for the rejection, that "The chief fallacy of this contention lies in its major premise"; and with the statement that "The determinations made by the Commissioner were neither arbitrary nor unreasonable under the circumstances of the investigation."

I particularly disagree with the apparent assumption of the opinion that because the revenue agents found it difficult under the circumstances to reach correct conclusions, they and the commissioner were relieved of the obligation of making reasonable determinations as near correct as reasonably possible.

Under the undisputed facts in this case and the findings of the Tax Court, it is quite clear to me that certain of the determinations were not only incorrect but were arrived at under the application of the principle implicit in the majority opinion that, under the circumstances of this case, it was the right, if not the duty, of the agents and the commissioner to throw the book at the taxpayers by making extreme determinations leaving them to avoid their effect if they can. I do not know of a single decision which has so held. Indeed, I regard it as settled that the prima facie presumption which attends the determinations of the commissioner is based upon a principle the exact contrary of this. This principle is that he has acted fairly and reasonably in making

his determinations and is prepared to support them with evidence if credible evidence that they are incorrect, is offered.

Acting in this case in accordance with the guiding influence of the correct principle, instead of blindly following the determinations of the commissioner, the Tax Court in the main, after a painstaking and searching consideration of the record as a whole, accepted some and rejected others of his determinations, basing its findings on its view of the state of the evidence.

Because it did so, I agree with the majority, except as to the two matters referred to above and hereafter briefly discussed, that its finding and conclusions are not clearly erroneous and should be affirmed.

Upon the first question, the value of the security deeds, I am of the firm opinion that the majority, in stating on page 246 of 250 F.2d that "It was not arbitrary for the agents to consider as worth face value notes which the taxpayer had exacted when he sold the various parcels of real estate",[1] acted upon a patently unsound premise.

I am of the equally firm opinion that the Tax Court gravely erred when, without any testimony to the contrary and in the face of the testimony of all the witnesses as to their value, though conceding that the commissioner had erroneously determined that their fair market value was their face, it reached up into the air to pluck a figure down to which no one testified and which a mere reading of the record will show is not only unsup-

[1]. "As to this item, the agents took the full amount of the notes, which was neither arbitrary nor without support even though the Tax Court later found that 70 percent of the face of these notes was the correct value. It was not arbitrary for the agents to consider as worth face value notes which the taxpayer had executed when he sold the various parcels of real estate and which he was currently collecting according to their terms, including interest of from 5 to 8 percent."

ported by, but is contrary to, all of the testimony.

It will serve no useful purpose for me to set out this testimony. It is sufficient to say: that the statements in the brief of the petitioner as to the state of the evidence are completely accurate, that neither the brief of the taxpayer, the opinion of the Tax Court, nor that of the majority of this court in any manner contradicts these statements; and that, when the nature and character of the property are considered, there is not only no reasonable basis but no basis whatever for a finding that the fair market value of the security deeds as a whole was 70 percent of their face, none that they exceeded 50 percent of their face.

As to the second question, the claim of the petitioners to capital gains treatment, a matter which the majority opinion does not even treat at all, except by a sweeping dictum, I think it completely clear that, upon this record and the controlling cases from this court, the finding of the Tax Court is mere fiating without any support in the evidence, indeed directly contrary to it.

In support of their claim that they were entitled to capital gains treatment on the sale of the properties in question, petitioners testified without contradiction that the 58 pieces of property in question were acquired for rental purposes and that they were not held for sale to customers in the regular course of their business.

The Commissioner introduced no evidence whatever to the contrary. The Tax Court, without pointing to any evidence in support of its conclusion except that the petitioners did have other properties which were held for sale, lumped all of their properties together, though some were and some were not held for sale, and by its mere say so brushed away the testimony of petitioners which was not contradicted and was not shown in any manner to be unreliable.

It seems to me that the decision of the Tax Court and of the majority on this issue runs directly counter to the reasoning and the decisions of this court in J. H. Robinson Truck Lines v. Commissioner, 5 Cir., 183 F.2d 739, Cf. Hightower v. Commissioner, 5 Cir., 187 F.2d 535, and Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 192 F.2d 633, and in Smith v. Dunn, 5 Cir., 224 F.2d 353; Foran v. Commissioner, 5 Cir., 165 F.2d 705, and other cases from this court, particularly Ross v. Commissioner, 5 Cir., 227 F.2d 265; Consolidated Naval Stores v. Fahs, 5 Cir., 227 F.2d 923, and Goldberg v. Commissioner, 5 Cir., 223 F.2d 709.

I dissent from the affirmance of the Tax Court's decision on these two issues.

Rehearing denied: HUTCHESON, Chief Judge, concurring in part and dissenting in part.