ALLAN B. SCHACHTER AND RUTH G. SCHACHTER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Schachter v. Commissioner
Docket Nos. 5422-83, 5485-83, 5648-83.
United States Tax Court
T.C. Memo 1986-292; 1986 Tax Ct. Memo LEXIS 317; 51 T.C.M. (CCH) 1428; T.C.M. (RIA) 86292; July 15, 1986. David A. Brownlee, for the petitioners. Edward J. Laubach, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACTS AND OPINION SHIELDS, Judge: Respondent determined deficiencies in income tax due from petitioners for 1980 as follows: Petitioners
Docket No.
Deficiency
Allan B. Schachter and
5422-83
$30,135.00
Ruth B. Schachter
Barry B. Sokolow and
5485-83
11,784.00
Arlene Z. Sokolow
Frank H. Kush and
5648-83
29,190.00
Margaret B. Kush
The only issue for our decision is what is the fair market value of certain opals donated by petitioners to the Carnegie Museum of Natural History. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. At the time their petitions were filed, all petitioners resided in the State of Pennsylvania. Each pair of petitioners filed a joint Federal income tax return for the taxable year 1980 with the Internal Revenue Service Center at Philadelphia. During 1979 and 1980, Sokolow [2] was a certified public accountant *319 and a practicing lawyer. In his practice he rendered tax advice, did tax planning and prepared income tax returns. His clients included the Schachters and the Kushes. Kenneth Helfand, a friend of Sokolow, was the president during 1979 and 1980 of Australian Mining and Exploration Company which purchased, carved, and resold opals. From discussions with Helfand, Sokolow learned of possible tax advantages which an individual could obtain by purchasing carved opals from Australian Mining and after the appropriate statutory period donating them to a charitable organization at a value in excess of their original purchase price. In 1979 Sokolow told the Schachters and the Kushes that he was going to purchase some opals and subsequently make "the necessary" donations. Upon his advice they decided to do the same. Through Helfand, Sokolow arranged for the purchase of all of the opals and neither Schachter nor Kush participated in the negotiations. However, all of petitioners, including Sokolow, relied upon Halfand to select the particular opals they purchased because none of them had ever dealt *320 in opals. Petitioners merely advised Australian Mining through Helfand of the amount of money they wished to spend and made no attempt to specify the number, size, color, or shape of the opals they were buying. On December 19, 1979, Sokolow purchased four opal carvings from Australian Mining for $4,977. The purchase was represented by two invoices which Sokolow received from Australian Mining. The first invoice reflected the purchase of a rough opal weighing 623.4 grams for $3,777. The second invoice reflected labor charges of $1,200 to carve the opal into four separage carvings. On December 21, 1979, Schachter purchased two opal carvings and a free-form [3] specimen from Australian Mining for $10,059. His purchase was represented by four invoices which Schachter received from Australian Mining at the time of the purchase. One invoice reflected the purchase of a rough black opal weighing 69.7 grams for $7,159. A second invoice reflected the purchase of a rough opal weighing 93.4 grams for $1,900. The other two invoices reflected labor costs totaling $1,000 for carving and finishing the opals into the two carvings and the free-form specimen. *321 On December 21, 1979, Kush also purchased a finished free-form opal specimen from Australian Mining for $9,420. His purchase was represented by two invoices which Kush received from Australian Mining. One invoice covered the purchase of a rough semi-black opal weighing 210.5 grams for $9,020 and the other reflected labor charges of $400 to finish the opal into the free-form specimen. Australian Mining had the purchases appraised by David Wilber on December 26, 1979 which was prior to their delivery to petitioners. The record does not reveal the amount for which he appraised Schachter's carvings and specimen, but he appraised Sokolow's carvings at $20,703 and Kush's specimen at $49,770. On December 30, 1979, Ben Gordon appraised all of the purchases for Australian Mining. He assigned total values to the purchases made by Schachter, Sokolow and Kush of $53,406.50, $28,310.45, and $47,103.75, respectively. Gordon was chosen by Helfand because he was willing to assign values within ranges suggested by Helfand. Petitioners did not see their opal carvings and specimens until their receipt in January of 1980. At or about the time of their receipt, petitioners also received letters *322 from Delbert Oswald of the Carnegie Museum of Natural History soliciting the contribution of the opals to the museum. The letters had been written at the request of Helfand who was a personal friend of Oswald. Each letter mentioned the tax benefits to be derived from the solicited contribution and that the museum was qualified under section 170 and section 501 to receive tax deductible donations. On December 23, 1980, Wilber, at the request of petitioners, updated his appraisals. At that time he assigned a fair market value to the Schachters' two carvings and specimen of $15,603, the Sokolows' carvings of $24,843.60 and the Kushes' specimen of $57,768.75. On December 24, 1980, Antonio Bonanno appraised the Schachters' free-form specimen at $43,061. On December 23, 1980, the Schachters, Sokolows, and Kushes donated their opals to the Carnegie Museum. The museum placed them on its books at $60,047, $24,844, and $49,770, respectively, but did not have them appraised. On January 19, 1981, Gordon, without reappraising the opals, updated his estimate of their fair market values to $58,747.15, $19,729.00, and $51,814.13, respectively. On their 1980 income tax returns, the Schachters, *323 Sokolows and Kushes claimed deductions for the contributions of the opals to the Carnegie Museum in the respective amounts of $54,664, $24,844, and $57,769. Insofar as applicable here respondent disallowed the deductions for lack of substantiation by petitioners as to the value of the opals on the date of their contribution. [4]
In February 1984, respondent had the opals appraised by Cosmo Altobelli and Elly Rosen. Altobelli valued the opals of the Schachters, Sokolows, and Kushes at $2,775, $4,175, and $900, respectively. Rosen's appraisals were $1,114.87, $1,748.47, and $480.03, respectively. OPINION Where, as here, a contribution is made in property other than money, the amount of the contribution is the fair market value of the property as of the date contributed, reduced when applicable as provided in section 170(e)(1). [5] The generally *324 accepted definition of fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. Fair market value as of any given date is a question of fact to be resolved by considering all relevant evidence in the record. [6]Kaplan v. Commissioner,43 T.C. 663, 665 (1965). *325 Respondent in his statutory notices of deficiency originally asserted that the value of the opals in each case on the date of their contribution did not exceed their purchase price. However, in his answer respondent asserted that the fair market value of the opals was in fact less than their original purchase price. Consequently, respondent has the burden of proof that the values were less than the purchase prices and petitioners have the burden of proof that the values were greater than the purchase prices. Rule 142(a). In support of respondent's contentions the record contains appraisal reports by two experts, Cosmo Altobelli and Elly Rosen. Altobelli has been an appraiser of gems since 1948 and is a graduate of the Gemological Institute of America. He is a certified gemologist appraiser, an author of a book on guidelines for jewelry appraisal and a member of the Appraisal and Ethics Committee of the American Gem Trade Association. He is obviously a qualified gem appraiser, but he does not specialize in opals. Consequently, he felt it was necessary to have his appraisals reviewed and confirmed by opal specialists. The specialists, however, did not appear as witnesses and *326 their testimony and qualifications are not before us. Therefore, we are unable to attribute any weight to conclusions of such specialists. Rosen, respondent's other expert, is a gemological consultant and a graduate of the Gemological Institute of America, having completed a two-year course of instruction in diamonds, colored stones and gem identification. He has taught valuation theory and the appraisal of gemstones at the university level and has performed consulting work and tested gemological instruments for trade magazines in the industry. He is a senior member of the American Society of Appraisers. However, at the date of his appraisal in this case, he had been an appraiser for only two years. When examined by Altobelli and Rosen in February of 1984 the free-form opal of the Kushes was crazed. [7] The crazing had occurred sometime after Gordon's examination and appraisal in December of 1979. Rosen testified that the opal would have appraised for twice the $480 value he ascribed to it had it not been crazed. Altobelli did not indicate how much the crazing affected the value of $900 which he placed on the opal. *327 Rosen also testified that in his opinion the Schachters' free-form specimen had been chemically treated in an attempt to pass it off as a more expensive opal. However, the other appraisers including Altobelli, testified to the contrary and we are satisfied that Rosen's conclusion in this regard was erroneous. In support of petitioners' claims the record contains five appraisals of all of the opals and a separate appraisal of the free-form specimen of the Kushes. Two complete sets of appraisals were prepared by Gordon and Wilber and one set by Oswald.The separate appraisal of Schachter's opal was made by Bonanno. Gordon appraised the opals for Australian Mining. He is a member of the American Society of Appraisers and had been a gem appraiser for thirteen years at the time he first examined the opals in this case. As set forth in our findings, the opals of the Kushes and the Schachters were first appraised by Gordon after their purchase, but prior to their delivery. In the case of the Sokolows, he first appraised the opals prior to their purchase and delivery. Before the appraisals were made, Gordon was informed by Helfand that the appraisals were being obtained for the purpose *328 of supporting the value of future donations to museums. Furthermore, in each case he was instructed by Helfand that he was not to furnish an appraisal unless he could appraise the opals for the amount suggested by Helfand. With these instructions and under the circumstances, we can only conclude that Gordon's first appraisal was conducted with a serious lack of objectivity and independence and cannot be taken at face value. Moreover, since Gordon's second appraisal amounted to nothing more than a reassignment of value to an earlier unreliable appraisal it follows that it cannot be given much weight. In March 1984, Oswald appraised the opals donated by the Schachters, Sokolows, and Kushes at $57,378, $26,201, and $49,784, respectively. Oswald's experience in the field dates back to 1942 when he received an engineering degree in geology and mineralogy from Brigham Young University. Thereafter he was employed for may years by United States Steel in the field of mineral exploration before going with the Carnegie Museum. He retired from the museum in 1980 after serving for ten years as its curator of gems and minerals. Since 1980 he has been an independent gemological appraiser, a *329 senior member of the National Association of Jewelry Appraisers, and a graduate gemologist. With such long and varied experience, Oswald is obviously a qualified expert in the field, but as set forth in our findings as curator of the museum he solicited the contributions from petitioners and has been a close personal friend and associate of Helfand for many years. Consequently, his appraisals also lack objectivity and cannot be accepted at face value. Wilber also first appraised the opals for Australian Mining. Later, without reexamining the opals, he updated his appraisal and assigned values to the opals of the Schachters, Sokolows and the Kushes of $15,603.00, $24,843.60, and $57,768.75, respectively. He is a member of the National Association of Jewelry Appraisers and had been a gemstone dealer for 13 years at the date of his appraisals. Wilber has also served as a lecturer on the subject of gems and minerals. He has no formal training in gemstones or appraising and had been an appraiser for only two years when he first examined the opals. By the time of trial he had made approximately 50 appraisals of opals but only two were performed for clients other than Australian Mining. *330 Here again we are unable to accept Wilber's appraisal at face value not only because of his limited experience, but because of lack of independence and objectivity. The last appraisal was conducted by Bonanno and was limited to the free-form specimen of the Schachters. He did not testify at the trial, and we have no knowledge of his qualifications. Consequently, we are unable to attribute any weight to his conclusions. In addition to the shortcomings which we have already discussed with respect to petitioners' appraisals, we also note that in every case the appraisals were in excess of five times the actual purchase price paid by petitioners. With no evidence in the record tending to support such dramatic increases in value, we conclude that petitioners' appraisals are exaggerated to the point that the appraisals and their makers are not credible. See Chiu v. Commissioner,84 T.C. 722, 734 (1985); Fuchs v. Commissioner,83 T.C. 79, 99 (1984); Dean v. Commissioner,83 T.C. 56, 75 (1984). Although opinion evidence is obviously admissible *331 and relevant on the question of value, we must weigh such evidence in the light of the demonstrated qualifications of the experts and of all other relevant evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Furthermore, we are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. From the record before us we are satisfied that in each case both parties have failed to carry their burden of proof. In other words, from the record as a whole, we conclude that the most reliable and probative evidence of value *332 is the purchase price paid by petitioners for the opals a little more than a year prior to their donation to the museum. See Chiu v. Commissioner,supra at 736; see also Estate of Kaplin v. Commissioner,748 F.2d 1109, 1111 (6th Cir. 1984), revg. a Memorandum Opinion of this Court. Furthermore, no evidence was presented which tended to establish any circumstance or development justifying any increase or decrease in value between the purchase and the donation of the opals. Consequently, we find that the purchase price paid by petitioners in each case represents the fair market value of the opals on the date of the contributions. We now turn to the issue of whether petitioners are subject to an addition to tax under section 6621(d) which provides for an increase in the interest accruing after December 31, 1984 where there is a "substantial underpayment." An underpayment is substantial if at least $1,000 of the underpayment in any taxable year is "attributable to 1 or more tax motivated transactions." Sec. 6621(d)(1) and (2). A "tax motivate transaction" *333 is "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). Under section 6659(c), a "valuation overstatement" exists if the value of property claimed on a return is at least 150 percent greater than the amount determined to be the correct valuation of the property. In each of the cases before us at least $1,000 of the underpayment in tax is attributable to the overvaluation of the property donated to the museum. Furthermore, the value of the property reported on the return of petitioners in each case is greater than 150 percent of the amount we have determined to be the correct value of such property. From the record as a whole we are also satisfied that petitioners in each case were participants in a tax motivated transaction, i.e., a scheme to claim excessive deductions for charitable donations through the overvaluation of the contributed property. We conclude, therefore, that petitioners in each case are liable for the addition to tax provided by section 6621(d) and that they are not prejudiced by the fact that we have raised this issue sua sponte and post trial. See Johnson v. Commissioner,85 T.C. 469 (1985). Decisions *334 will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing and opinion: Barry B. Sokolow and Arlene Z. Sokolow, docket No. 5485-83; and Frank H. Kush and Margaret B. Kush, docket No. 5648-83.↩
2. All references to Sokolow, Schachter or Kush in the singular are to male petitioners.↩
3. A free-form opal specimen is an opal that has not been carved and has no visible design in its execution. It is typically polished and has one flat surface so that it can be placed on display in an upright position.↩
4. In the statutory notice respondent also stated that petitioners had failed to establish the donations were completed during 1980, but prior to trial respondent conceded that petitioners made completed gifts to the Carnegie Museum during 1980.↩
5. Section 170(e)(1) reads in pertinent part as follows: (1) General Rule. -- The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of -- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), * * *. However, section 170(e)↩ is not applicable here because on the dates of the contributions petitioners had owned the opals for more than one year and would have qualified to treat any gains from their sale as long term capital gains under section 1222. 6. The fair market value of art can be the object of considerable disagreement among appraisers. See Neely v. Commissioner,85 T.C. 934 (1985); Chiu v. Commissioner,84 T.C. 722 (1985); Anselmo v. Commissioner,80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The Tax Reform Act of 1984 amended section 6659 so as to provide increased additions to tax for valuation overstatements, reporting requirements for charitable donees which receive property and dispose of it within two years and detailed appraisal requirements. When applicable, the statute requires the donor to obtain a "qualified appraisal" which, pursuant to the Temporary Regulations, means the appraisal must have been conducted by a qualified appraiser not earlier than 60 days prior to the contribution. Section 6659(f); section 1.170A-13T(c)(3)(i)(A), Temporary Income Tax Regs., 48 Fed. Reg. 50659 not a party to the transaction in which the donor obtained the property nor related to any person whose relationship to the donor would cause a reasonable person to question their independence. See section 1.170A-13T(c)(5), Temporary Income Tax Regs., 48 Fed. Reg. 50659↩ (Dec. 31, 1984).
7. Crazing is cracking that takes place in an opal and is caused by dehydration or abuse. Crazing causes the value of the opal to decrease.↩